UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X

BRUCE W. MIKOL,                         :
                                              05 Civ. 5355 (WCC)
                    Plaintiff,          :

          - against -                   :        **OPINION**
                                              **AND ORDER**
JO ANNE B. BARNHART, Commissioner of    :
Social Security,
                                        :
                    Defendant.
                                        :
- - - - - - - - - - - - - - - - - - - - - X

**A P P E A R A N C E S :**

                              LAW OFFICES OF CAROL S. GOLDSTEIN
                              **Attorneys for Plaintiff**
                              424 N. Main Street
                              P.O. Box 525
                              Monroe, New York 10950

CAROL S. GOLDSTEIN, ESQ.

          Of Counsel

                              MICHAEL J. GARCIA
                              UNITED STATES ATTORNEY FOR THE
                                SOUTHERN DISTRICT OF NEW YORK
                              **Attorneys for Defendant**
                              86 Chambers Street, 3rd Floor
                              New York, New York 10007

JOHN E. GURA, JR.,
     Asst. United States Attorney

          Of Counsel

Of Counsel:
   Barbara L. Spivak, Esq.
   Chief Counsel-Region II
   Suzanne Haynes
   Assistant Regional Counsel
   Office of the General Counsel
   Social Security Administration
   New York, NY 10278

                    **Copies Mailed to Counsel of Record_____**

CONNER, Senior D.J.:

This is an action brought by plaintiff Bruce W. Mikol pursuant to 42 U.S.C. § 405(g) of the Social Security Act (the "SSA"), to review the final determination of defendant Jo Anne B. Barnhart, Commissioner of Social Security (the "Commissioner") determining that plaintiff was not disabled from November 7, 2001 to October 21, 2004. Both parties have moved for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c). For the reasons discussed below, the Commissioner's motion is granted and her decision is affirmed.

**BACKGROUND**

I.   **Procedural History**

Plaintiff filed an application for disability insurance benefits on October 31, 2002. (Tr. 12, 96-98.)[1] After his application was denied (Tr. 62-64), plaintiff requested a hearing to review the denial. (Tr. 67.) That hearing was held on May 21, 2004, before Administrative Law Judge Dennis Katz (the "ALJ"). (Tr. 20-58.) The ALJ, considering the case *de novo*, found by decision dated August 3, 2004 (the "ALJ's decision") that plaintiff was not disabled as defined under the SSA. (Tr. 20-58, 9-19.) Plaintiff then requested a review by the Appeals Council, which denied plaintiff's request on March 25, 2005, thereby rendering the ALJ's decision final as of that date. (Tr. 3B-5.)

II.   **Plaintiff's Personal History and Testimony**

Plaintiff was born on August 14, 1959. (Tr. 96.) He is right-handed, (Tr. 26, 187.) and is

---

[1] "Tr." refers to the consecutively paginated administrative record filed by the Commissioner as part of her answer. *See* 42 U.S.C. § 405(g).

a smoker.  (Tr.  222, 223, 281, 287, 344, 767.)  After completing high school in 1977 (Tr. 18, 115, 186), he worked at Materials Research Corporation ("MRC") for nineteen years in various departments including shipping and receiving, building maintenance and the mailroom.  (Tr. 39-40, 144-45.)  The tasks he performed included maintaining inventory stock, sorting and delivering mail, delivering freights between buildings, lifting drums of material, and cleaning buildings, which required plaintiff to perform at a medium level of physical exertion.  (Tr. 39-41, 110, 144-45, 749.)

After MRC, plaintiff worked for two years as a shipping and receiving clerk for K&M Newspaper Inc., where he shipped manufactured parts to customers, received parts from vendors, maintained the inventory stockroom and assembled manufactured pieces to be shipped to customers. (Tr. 144.)  These tasks required him to work at a medium level of physical exertion.  (Tr. 41.)  In addition, he worked nights at K-Mart as a stock clerk from 1997-1998.  (Tr. 110, 119, 749.)  Plaintiff was then employed as the assistant manager of a Stewart's Shop for one year, where he was in charge of the day-to-day operations of the store.  (Tr. 144.)  According to plaintiff, this work, which included stocking shelves, required him to stand for long periods of time.  (Tr. 24, 41.)

Plaintiff most recently was employed for two years as an orderfill associate with Allegiance Healthcare Corporation, where he worked until the time of his work-related injury.  (Tr. 24-25, 119, 144.)  This job involved lifting boxes, ranging from five to sixty pounds each, and operating a forklift. (Tr. 24, 144.)  Plaintiff alleges that all of the jobs performed required frequent standing, walking, bending and heavy lifting.  (Tr. 749-50.)

Plaintiff initially alleged that he became disabled on June 28, 2000 (the "onset date") while lifting boxes at work.  (Tr. 165.)  He suffered injuries to his shoulders and right knee.  (Tr. 12, 109.) Plaintiff also began complaining of arthritis on that date.  (*Id.*)  Plaintiff returned to work twice after

2

the onset date, from March 2001 to June 2001 and again from August 2001 to November 2001.  (Tr. 109.)  Plaintiff then allegedly suffered injury to his shoulders on November 7, 2001 when, while at work, he lifted a surgical kit box that weighed approximately fifty-five pounds.  (Tr. 24, 109, 164, 483.)  Plaintiff amended the onset of disability date to November 7, 2001 (the "amended onset date") because plaintiff actually stopped working due to injury on that date.  (Tr. 12, 23, 25, 109.)

According to plaintiff, he can no longer work due to carpel tunnel syndrome, limited lifting capacity and constant pain in his shoulders.  (Tr. 26-27, 28, 34-35, 36.)  At the hearing, he stated that his injuries limited his ability to lift light objects above his shoulders or to lift an object for longer than a short period of time.  (Tr. 26.)  He testified that, because of carpal tunnel syndrome, he suffers from hand cramps when he writes or cooks and he is unable to hold a telephone receiver for extended periods of time.  (Tr. 26-27, 34-35.)  In addition, he suffers from stiff, stabbing pains in his shoulders.  (Tr. 27, 35-36.)  At the time of the hearing, plaintiff lived with his wife and two children, then ages thirteen and six.  (Tr. 32.)  He testified that he is capable of doing light laundry, house work and grocery shopping as well as driving his six-year-old daughter to the bus stop and picking her up from school, if necessary.  (Tr. 32, 33, 38, 186.)  As a result of his injuries, he is unable to play with his six-year-old daughter, bowl, run or walk at a fast pace.  (Tr. 38, 53.)  He also walks with a limp.  (Tr. 54.)  Generally, he stays in a recliner to elevate his feet, take the weight of his legs and hips and alleviate the pain in his shoulders.  (Tr. 33, 51-52, 186.)

He takes ibuprofen, but this only mitigates rather than eliminating the pain.  (Tr. 32.)  Plaintiff also complains of pain in his legs and lower back, such that he cannot sit for more than ten to fifteen minutes without the need to stretch his legs or sit for more then seven or eight minutes because of the pressure on his hips.  (Tr. 28-30, 51-53.)  The difficulty with his legs and hip appear

3

to be related to Legg-Calve Perthes disease that he has had since he was eight years old. (Tr. 28-30.)

### III.  Medical History

Plaintiff's relevant medical history involves myriad  medical opinions given both before and after the amended onset date.  These opinions and treatment will be noted in chronological order insofar as possible.

#### A.  Medical Condition Before Amended Onset Date

At the age of eight, plaintiff was diagnosed with Perthes disease[2] that affected his right hip. (Tr.  747.)  He used a crutch and harness for five years and, at the age of fourteen, began having intermittent pain in his right hip that has gradually worsened.  (*Id.*)  He also has aching and stiffness in his right knee.  (*Id.*)  As a result of the Perthes disease, his right leg is one-and-a-quarter inches shorter than his left leg and he wears corrective shoes with a "lift" to compensate for the difference in length.  (Tr. 14, 28, 747.)

Plaintiff injured his right shoulder at work on June 28, 2000.  (Tr. 495.)  The pain he initially experienced in his right shoulder spread to his right arm.  (Tr. 369.)  Following his injury, he was treated by Harold Pearson, M.D. who recommended physical therapy and ordered an MRI. (Tr. 369.) The MRI of plaintiff's right shoulder, performed on September 7, 2000, revealed teninosis of the rotator cuff and "type II low-lying and laterally downsloping acromion." (Tr. 369, 404.)  After the MRI, Dr. Pearson recommended arthroscopic surgery to correct the impingement on plaintiff's right

---

[2] Perthes disease is a degenerative disease of the hip joint, where the ball of the femur and surface of the hip socket deform as a result of bone mass loss.

4

shoulder, which was performed January 25, 2001.  (Tr. 94, 185, 369, 377-78.)

Plaintiff returned to work in March 2001 on "light duty," which limited him from lifting anything exceeding ten pounds.  (Tr. 495.)  He left work again in June 2001.  (Tr. 25, 109.)  On June 8, 2001 plaintiff had x-rays taken of his right knee, right ankle and right hip.  (Tr. 464.)  The x-rays of his right knee and right ankle indicated that there were no significant soft tissue abnormalities and no fractures or dislocations.  (*Id.*)  The x-ray did, however, reveal irregularity of the joint space in the right foot and deformity of the femoral head with arthritic changes in the hip joint.  (*Id.*)  In addition, plaintiff had an MRI taken of of his right knee on June 11, 2001.  (Tr. 466.)  The MRI revealed a small joint effusion and "mild degenerative changes of the posterior horn of the medial meniscus," but there was no evidence of a meniscal tear.  (*Id.*)

On July 19, 2001, plaintiff was admitted to Good Samaritan Hospital for a whole body bone scan.  (Tr. 467.)  The scan noted changes in the right femoral head, but not elsewhere.  (*Id.*)  It was unclear what caused the changes in the right femoral head.  (*Id.*)  Further evaluation of the hip with MRIs was recommended.  (*Id.*)  Plaintiff saw Herbert Garcia, M.D. on July 25, 2001 after having range of motion and muscle testing done on his right shoulder.  (Tr. 527.)  This exam was an initial exam to serve as an "objective baseline" to determine plaintiff's conditions that existed at the time and any subsequent improvements.  (*Id.*)

In August 2001, plaintiff returned to work (Tr. 25, 109) and experienced pain in his right knee.  (Tr. 155.)  On August 21, 2001 Dr. Pearson performed an arthroscopy and chondroplasty of the tibia at the Horton Medical Center to repair internal derangement in the knee.  (Tr. 94, 149, 151, 155, 465, 823.)  Plaintiff's postoperative diagnosis was chondromalacia or softening of the joint cartilage with flattening in both femora.  (Tr. 155.)  The surgery revealed fragments of degenerating

fibrocartilage, hyaline cartilage and synovial tissue.  (Tr. 156.)

Plaintiff saw Sue Ellen Levy, M.D., a neurologist at Dolson Avenue Medical, on September 20, 2001 for an initial neurological evaluation for complaints of right shoulder pain after having been referred to her by Dr. Garcia.  (Tr. 535.)  Dr. Levy determined that plaintiff had "traumatic cervical myofascial pain" to his right shoulder following surgery and internal derangement of his right shoulder.  (Tr. 535-38.)  Dr. Levy recommended that plaintiff undergo an x-ray and MRI of his left shoulder to rule out derangement and continue physical therapy.  (*Id.*)  Dr. Levy determined that plaintiff has a permanent partial disability, which was moderate to severe in nature.  (*Id.*)

### B.   Medical Condition After Amended Onset Date

After suffering a work-related injury on November 7, 2001, (Tr. 379-80) plaintiff experienced pain in his left shoulder and sought emergency treatment.  (Tr. 380.)  He was again referred to an orthopedist, Dr. Pearson, who ordered an MRI on plaintiff's left shoulder that was performed on November 21, 2001.  (Tr. 158, 405.)  The MRI revealed a "compromise of the subacromial space secondary to a type II acromion which is low-lying" and "a moderate degree of supraspinatus tendinosis."  (Tr. 405.)  Following the MRI, Dr. Pearson diagnosed plaintiff with impingement syndrome and prescribed medication and physical therapy.  (Tr. 158.)  Plaintiff was reluctant to begin physical therapy because it had been unsuccessful in the past.  (Tr. 381.)

On December 6, 2001, plaintiff saw Dr. Levy for an initial neurological evaluation of his left shoulder after having been referred to her by Dr. Garcia.  (Tr. 549-51.)  This examination was only partially completed because plaintiff became distressed during the exam and did not want to continue.  (*Id.*)  Plaintiff appeared alert and oriented and his higher cognitive functions were intact.

6

(*Id.*)  An examination of plaintiff's motor systems appeared normal.  (*Id.*)  Dr. Levy recommended that plaintiff continue with physical therapy three times a week and return in a week to complete the neurological exam.  (*Id.*)

Plaintiff saw Dr. Garcia on December 10, 2001 for range of motion and muscle testing.  (Tr. 563.)  Plaintiff was able to move his left shoulder with pain.  (*Id.*)  Dr. Garcia recommended continuation with physical therapy to decrease pain and increase the range of motion.  (*Id.*)  Dr. Levy did a neurological re-evaluation of plaintiff's shoulder on January 3, 2002 to follow up after the previous evaluation.  (Tr. 568-69.)  After a physical exam, Dr. Levy found tenderness over the right supraspinatus tendon and over the bicipital tendon.  (*Id.*)  Dr. Levy recommended that plaintiff continue physical therapy, follow up with neurology in six to eight weeks and follow up with Dr. Pearson regarding his shoulder arthropathy.  (*Id.*)  Plaintiff was evaluated by Dr. Pearson at the Horton Medical Center on December 17, 2001.  (Tr. 767-68.)  The examination revealed signs of impingement on the left shoulder and tenderness.  (*Id.*)

On January 17, 2002, Dr. Pearson performed arthroscopic surgery on plaintiff's left shoulder at Horton Medical Pavilion.  (Tr. 158, 164, 185-86, 393, 394, 483, 763-66, 782, 787.)  The procedure was to correct a partial tear of the rotator cuff, impingement on the left shoulder and reactive synovitis.  (Tr. 393.)  After the procedure, plaintiff continued physical therapy that consisted of massage, heat, electrical stimulation, weight work, biking and stretching.  (Tr. 158.)

Plaintiff returned to Dr. Levy after complaining of neck pain on February 21, 2002.  (Tr. 382-86, 583.)  Dr. Levy performed another neurological evaluation and an electrodiagnostic study to rule out cervical radiculopathy.  (Tr. 382-86, 583-86.)  An examination of plaintiff's physical, neurological and motor systems appeared normal.  (Tr. 583-86.)  There was no evidence of cervical

7

radiculopathy.  (*Id.*)  However, an examination of the cervical spine revealed left cervical tenderness

and pain on left rotation.  (*Id.*)  There was also limitation in the range of motion of both shoulders.

(*Id.*)  Dr. Levy diagnosed plaintiff as having "traumatic cervical myofascial pain" and internal

derangement of the left and right shoulders.  (*Id.*)  The electrodiagnostic study showed evidence of

carpal tunnel syndrome.  (Tr. 382-86.)

      An MRI was performed on March 2, 2002 on plaintiff's cervical spine which revealed diffuse

posterior bulges.  (Tr. 406.)  The pain subsided but returned again in May 2002, as constant and

severe as before the operation.  (Tr. 164, 172.)  Plaintiff met with L. Paul Brief, M.D.,[3] his treating

physician, complaining of pain in the anterior aspect of his right shoulder and difficulty rotating,

reaching up high and dressing.  (Tr. 14, 172.)

      On April 15, 2002, plaintiff saw Elias D. Sedlin, M.D., a consulting physician, who noted

that plaintiff still had pain when he moved his shoulder, but not when he was resting it.  (Tr. 14, 158,

387-89.)  Although, he was still unable to lift anything heavy, he was "slowly" getting better.  (Tr.

158.)  Dr. Sedlin indicated that plaintiff had full range of motion of the cervical spine with the

exception of right rotation and right bending, which produced pain.  (Tr. 159.) Dr. Sedlin noted that

the cervical spine complaint may be causally related to the accident that occurred on November 7,

2001, but thought it was "odd that these complaints suddenly worsened significantly following his

left shoulder arthroscopy . . . ."  (Tr. 160.)  Dr. Sedlin was unable to find any evidence in the

available medical record to indicate that plaintiff did in fact injure his neck at the same time he

---

     [3] Plaintiff saw L. Paul Brief, M.D. as his treating physician.  However, he also saw Rochelle Brief, M.D., Ph.D. for a consultation and electrodiagnostic evaluation in 2002.  Any reference to "Dr. Brief" is to Dr. L. Paul Brief.  His full name will be used when discussing him in relation to Dr. Rochelle Brief.

injured his shoulder.  (*Id.*)  He also noted that plaintiff had fine finger dexterity and gross manual dexterity.  (Tr. 161.)  Dr. Sedlin determined that plaintiff was making a slow recovery relative to his injuries, was mildly disabled and could return to work, on light duty, immediately.  (Tr. 159, 161.)  He  suggested that plaintiff continue with physical therapy.  (Tr. 159-60.)

Plaintiff saw Dr. Garcia on April 23, 2002 for range of motion and muscle testing due to persistent symptomatology.  (Tr. 606.)  Plaintiff was able to move his left shoulder, but, with the exception of external rotation, all movements created pain.  (*Id.*)  Physical therapy was continued to decrease pain and increase range of motion.  (*Id.*)

On June 10, 2002, an MRI was performed on plaintiff's left shoulder which revealed severe supraspinatus tendinosis and "intrasubstance tearing of the supraspinatus tendon" and again showed "type II low lying acromion . . . ."  (Tr. 164, 407.)  The MRI revealed severe fraying and possible partial thickness tear of the rotator cuff.  (Tr. 250.)  Dr. Brief determined that plaintiff suffered from impingement syndrome and post arthroscopic surgery to his left shoulder.  (Tr. 164.)  Dr. Brief advised plaintiff that, in his opinion, the prior surgery had not been successful and advised plaintiff to consider open repair of the left shoulder impingement.  (*Id.*)

On July 25, 2002 plaintiff was admitted to Nyack Hospital to have surgery on his left shoulder to correct the impingement syndrome.  (Tr. 164, 174-82, 196, 199-201, 213-15.)  During the surgery, performed by Dr. Brief, a tear in plaintiff's rotator cuff was repaired, an osteotomy-resection was performed on the acromial spur and the lateral aspect clavicle, the subacromial bursitis was resectioned and the coracoacromial ligament was released.  (Tr. 164, 178, 202-05. )  The surgical pathology report revealed that the bone and soft tissue had degenerative and reactive changes.  (Tr. 182.)  Following the surgery, plaintiff also saw Dr. Garcia for range of motion and muscle testing

due to "persistent symptomatology." (Tr. 624.)  Dr. Garcia tested with resulting pain the range of motion in plaintiff's left shoulder, but was unable to test internal and external rotation or perform muscle testing because of the recent surgery.  (*Id.*)

Following the surgery on his left shoulder, plaintiff began to experience intermittent pain in his right shoulder and had difficulty rotating, reaching up and dressing. (Tr. 165, 273.)  On August 6, 2002, plaintiff again visited Dr. Brief. (Tr. 165.)  He had limited range of motion in his right shoulder and it appeared as "a frozen shoulder." (Tr. 165, 167, 172-73.)  Dr. Brief diagnosed plaintiff as suffering from impingement syndrome with a frozen right shoulder and recommended physical therapy and a cortisone injection. (Tr. 165, 171.)

On August 26, 2002, plaintiff again reported that he suffered from pain in his shoulder, but that it was improving with physical therapy. (Tr. 362.)  Plaintiff again saw Dr. Garcia on August 27, 2002 to have range of motion and muscle testing done. (Tr. 634.)  Plaintiff's range of motion with the exception of extension was tested, and he reported that he was in pain. (*Id.*)  Plaintiff indicated that his shoulder had improved initially after surgery but had gradually worsened. (*Id.*)  An MRI of plaintiff's right shoulder was performed on August 29, 2002, which showed progressively worsening impingement syndrome and supraspinatus tendinosis. (Tr. 369, 408.)  Plaintiff returned to Dr. Brief on September 4, 2002, September 25, 2002 and October 9, 2002 and eventually surgery was scheduled for October 24, 2002 to correct the residual impingement in his right shoulder. (Tr. 94, 163, 165, 273-74.)

Plaintiff sought a consultation with Rochelle Brief, M.D., Ph.D., on October 15, 2002. (Tr. 483-84.)  Dr. Rochelle Brief noted a left shoulder complete rotator cuff tear, impingement syndrome, cervical strain, "left cervical radiculopathy" and "left brachial plexopathy" and recommended that

plaintiff continue physical therapy with Dr. L. Paul Brief.  (Tr. 483.)  Dr. Rochelle Brief also

performed an electrodiagnostic evaluation on November 11, 2002 that consisted of a motor nerve

and sensory nerve conduction examination and needle EMGs.  (Tr. 484, 485.)  As a result of the

evaluation, Dr. Rochelle Brief determined that plaintiff suffered from mild to moderate carpal tunnel

syndrome in his left wrist and very mild carpal tunnel syndrome in his right wrist.  (Tr. 485.)

Plaintiff had tried left wrist splints without improvement and Dr. Rochelle Brief recommended

considering carpal tunnel release surgery if discomfort continued.  (*Id.*)

Plaintiff was admitted to Nyack Hospital on October 24, 2002 for surgery to repair a right

shoulder impingement and a torn rotator cuff.  (Tr. 94, 163, 167-70, 262, 288, 395-98.)  Dr. Brief

repaired the impingement, resectioned the coraco-acromial ligament and subacromial bursa and

osteotomy-resectioned the lateral aspect clavicle.  (Tr. 165, 167-70, 395-98.)  Surgical pathology

revealed that the bone and associated soft tissues from the right shoulder joint had "degenerative

changes of periosteal cartilage with adjacent reactive osteosclerosis," "reactive synovial hyperplasia

with fibrosis" and cellular bone marrow without any recognized abnormalities.  (Tr. 276.)

Plaintiff saw Thomas Li, M.D., a consulting physician, on December 3, 2002 for an

orthopedic examination.  (Tr. 185-88.)  Dr. Li noted that plaintiff appeared to be in no acute distress

and that his gait was normal.  (Tr. 186.)  Although he had some lower back pain getting on and off

the exam table, plaintiff did not need help changing for the exam and did not use any assistive

devices.  (Tr. 187.)  Plaintiff had full flexion, extension, lateral flexion bilaterally in his cervical

spine and full rotary movement bilaterally.  (*Id.*)  There was also no cervical or paracervical pain or

spasm.  (*Id.*)  Dr. Li found plaintiff to have full range of motion bilaterally in his shoulders, elbows,

forearms, wrists and fingers.  (*Id.*)  Dr. Li noted that plaintiff did not have joint inflammation,

11

effusion or instability.  (*Id.*)  In addition, plaintiff had full range of motion bilaterally in his hips, knees and ankles and his hand and finger dexterity was intact.  (*Id.*)  Dr. Li found that plaintiff suffered from traumatic arthritis in his shoulders bilaterally and in his right knee and there was mild limitation of prolonged or repetitive bending, kneeling, climbing, heavy lifting and carrying.  (Tr. 187-88.)

Dr. Brief again examined the plaintiff on December 10, 2002 and noted that the motion in the shoulder was improving, physical therapy was in progress and x-rays showed stable appearance of bony structures.  (Tr. 365.)  Plaintiff also saw Dr. Brief on January 21, 2003 and complained of stiffness in his right shoulder and pain in his left shoulder.  (*Id.*)  On February 26, 2003, plaintiff complained of pain in both shoulders and stated to Dr. Brief that he wanted to "get his life back." (*Id.*)  Dr. Brief advised him to continue with physical therapy and ordered an MRI for both shoulders. (*Id.*)  An MRI of plaintiff's right shoulder was performed on March 5, 2003 which revealed a partial tear of the rotator cuff on the bursal surface with no impingement and no biceps tendinitis.  (Tr. 369, 409.)  An MRI of plaintiff's left shoulder performed on the same date showed increased severity of mild subscapularis tendinosis with a probable tear since June 10, 2002.  (Tr. 410.)  The MRI of the left shoulder did not indicate biceps tendinitis and there no longer appeared to be a rotator cuff impingement.  (*Id.*)  Plaintiff also saw Dr. Brief on March 10, 2003 and April 28, 2003 complaining of pain in his shoulders and neck.  (Tr. 365.)

Plaintiff saw Richard Magill, M.D. on March 20, 2003 to have bilateral x-rays taken of his shoulders.  (Tr. 390-92.)  After examining the films, Dr. Magill recommended that plaintiff continue with home exercise for both shoulders.  (Tr. 391.)  Although he was unable to review the original and second operative reports, Dr. Magill estimated that plaintiff would be unable to return to heavy

labor, would experience persistent pain in his shoulder and he did not anticipate that plaintiff would recover full use of his shoulders. (Tr. 391-92.)

An MRI of plaintiff's left shoulder was performed on May 8, 2003 to evaluate for a labral tear. (Tr. 459-60.) The MRI indicated an "incomplete oblique tear of the anterior superior labrum" and fluid accumulation. (*Id.*) On May 15, 2003, an arthrogram was performed on plaintiff's left shoulder to again evaluate for a labral tear. (Tr. 461.) The arthrogram revealed an "[i]solated intrasubstance tear of the anterior inferior labrum" and "type II curved acromion." (*Id.*) On May 19, 2003, plaintiff again saw Dr. Brief complaining of pain in his left shoulder. (Tr. 363.) Dr. Brief's notes indicate that plaintiff sought a second opinion from Evan L. Flatow, M.D. (Tr. 363, 372-73.)

Dr. Brief believed that plaintiff was suffering from "a persistently sharp lateral clavicle" and biceps tendinitis. (Tr. 363.) On June 16, 2003, Dr. Brief evaluated the plaintiff and found that he had an 85% loss of use of his right arm and continued to have severe pain on both right and left sides. (*Id.*) When plaintiff met with Dr. Brief six weeks later on July 30, 2003, plaintiff "complain[ed] bitterly of neck pain" and numbness in both hands, which he had allegedly experienced for several months. (*Id.*) Dr. Brief noted that cervical spine motion was markedly decreased and painful, both wrists were tender and plaintiff had a paraspinal spasm and tenderness in the nucal and trapezius muscles, particularly on his left side. (*Id.*)

On August 6, 2003, Robert C. Hendler, M.D. saw plaintiff for an orthopedic consultation regarding his Workers' Compensation claim. (Tr. 369.) In Dr. Hendler's report, he indicated that, based on his examination of the plaintiff and a review of the medical records, plaintiff would have a permanent schedule loss of use of his right shoulder. (Tr. 370.) Specifically, Dr. Hendler determined that, based on the right shoulder on-the-job injury plaintiff suffered in June 27, 2000 and

13

subsequent arthroscopic surgeries, plaintiff would have a 55% schedule loss of use of the right shoulder and that, other than home exercises, no further treatment was necessary. (*Id.*)

Nevertheless, on September 4, 2003, plaintiff was admitted to Nyack Hospital for surgery to repair a left shoulder impingement, biceps tendinitis, a torn rotator cuff, a clavicle spur, acromial spur with impingement and subacromial bursitis. (Tr. 310, 316, 332-35, 345, 399-402.) At pre-operative examination on September 2, 2003, Dr. Brief noted that repeated X-rays indicated that the left shoulder and clavicle showed sharp prominence over the clavicle which was the likely cause of plaintiff tenderness. (Tr. 363.) An examination by Dr. Brief prior to the procedure indicated that the plaintiff's "left shoulder was severely tender over the superior aspect, lateral clavicle, and anterior biceps area" and his range of motion was restricted by shoulder scarring. (Tr. 319.) The surgical pathology report indicated that bone and soft tissues from left shoulder joint had "synovial hyperplasia, with mild chronic synovitis" and "myxoid degenerative change within tendinous tissue." (Tr. 331.)

Following surgery on September 4, 2003, plaintiff continued physical therapy and his left shoulder improved. (Tr. 361.) In early November 2003, Dr. Brief noted that while plaintiff's left shoulder was improving, his right shoulder was still problematic with decreased motion and stiffness. (*Id.*) In December 2003, plaintiff still had tenderness in his biceps, which was expected following the surgery, and his left shoulder was improving. (*Id.*) Plaintiff requested a new MRI on his left shoulder because of pain and stiffness on January 13, 2004. (*Id.*) Plaintiff's activities were increased but he continued physical therapy. (*Id.*) Plaintiff had an MRI performed on February 26, 2004 which indicated that plaintiff had developed worsening supraspinatus tendinosis since the last examination and a 1.5 cm tear. (Tr. 368, 723.) The MRI showed that the infraspinatus and

14

subscapularis tendons were intact.  (*Id.*)

# DISCUSSION

## I.    Standard of Review

### A.    Scope of Judicial Review

A court's review of the ALJ's decision regarding disability benefits is limited to determining whether the decision is based on correct legal principles and is supported by substantial evidence in the record.  *See* 42 U.S.C. § 405(g); *Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999).  Accordingly, a court reviewing a final decision by the Commissioner first must determine whether the correct legal standard was applied.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  If the Commissioner failed to apply the correct legal standard in making a determination, the reviewing court must not defer to the Commissioner's decision.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal.") (citation omitted).

If, however, the correct legal standard has been applied, the court must determine whether the decision was supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence in this context has been defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *see also Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).  Where substantial evidence exists to support the Commissioner's final decision, that decision must be upheld, even where substantial evidence supporting the claimant's position also exists.  *See generally Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *see also* 42 U.S.C. § 405(g) ("The findings of the Commissioner . . . as to

15

any fact, if supported by substantial evidence, shall be conclusive . . . .").  The role of the reviewing court is therefore "quite limited and substantial deference is to be afforded the Commissioner's decision."  *Burris v. Chater*, No. 94 CIV. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996).

### B.        Standard for Determining Disability Claims

The SSA defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  To qualify for benefits, the disability must be the result of an "anatomical, physiological, or psychological abnormalit[y] . . . demonstrable by medically acceptable clinical and laboratory diagnostic techniques." § 423(d)(3).  Further, such a disability will be found only if it is determined that the individual's "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ."  § 423(d)(2)(A).

Regulations of the Commissioner set forth a five-step analysis that must be used in evaluating a disability claim.  *See* 20 C.F.R. § 404.1520(a)(4).  "The Court of Appeals for the Second Circuit has described this five-step process as follows:

> 1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> 2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical capacity to do basic work activities.
>
> 3. If the claimant has a "severe impairment," the Commissioner must ask whether,

based solely on medical evidence, claimant has an impairment listed in Appendix 1 of the regulations.  If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4.  If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5.  If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other work, which the claimant could perform.  The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps."

*Carrington v. Barnhart*, No. 04 Civ. 5187, 2005 WL 2738940, at *5 (S.D.N.Y. Oct. 19, 2005) (quoting *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir. 2000)).  The claimant bears the burden of proof on all elements except the final one.  *See Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000).  If the claimant satisfies this burden and thereby establishes a prima facie case, the burden shifts to the Commissioner to prove the fifth element.  *See Carrington*, 2005 WL 2738940, at *5 (citing *Rivera v. Schweiker*, 717 F.2d 719, 722-23 (2d Cir. 1983)).

In examining a disability claim under the five-step analysis, the Commissioner is required to examine the following four factors:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  *Mongeur v. Heckler*, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted).  Moreover, in assessing medical evidence, the ALJ must distinguish between treating and nontreating physicians and lend a treating physician's opinion "controlling weight when that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence . . . .'"  *Carrington*, 2005 WL 2738940, at *6 (quoting 20 C.F.R. §

17

416.927(d)(2)).

### C.    The ALJ's Application of the Five-Step Analysis

The ALJ undertook the correct sequential inquiry in plaintiff's case.  First, the ALJ found that plaintiff was not engaged in substantial gainful activity, and had not been since the amended onset date.  (Tr. 18.)  Second, the ALJ found, based on the medical evidence in the record, that plaintiff's right hip, right knee, bilateral shoulder, hand and cervical problems post-surgery were severe.  (*Id.*)  However, in accordance with step three, the ALJ determined that these impairments were neither listed nor equal to any impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1.  (*Id.*)  At the fourth step, the ALJ concluded that plaintiff had the residual functional capacity to sit for up to and including eight hours, stand or walk for up to and including four hours in an eight-hour work day, can lift or carry objects weighing up to ten pounds, but cannot reach above his shoulders with either arm or perform repetitive finger tasks or fine manipulations more than 75% of the time during a typical work day.  (*Id.*)  Consequently, the ALJ held that plaintiff could return to work as either a telemarketer or surveillance monitor and, therefore, was not disabled as defined by the SSA.  (Tr. 17-18.)

### II.    Analysis

### A.    Plaintiff Received a Full and Fair Hearing

Before determining whether the ALJ's decision is supported by substantial evidence, the Court must determine whether plaintiff received a full and fair hearing.  *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Elias v. Apfel*, 54 F. Supp. 2d 172, 177 (E.D.N.Y. 1999).  "To have a full

18

and fair hearing, the ALJ must . . . explore all relevant facts to determine if there are inconsistencies in the medical record." *Rivera v. Apfel*, No. 98 CIV. 3393, 2000 WL 1201545, at *3 (S.D.N.Y. Aug. 22, 2000) (citing *Rosa*, 168 F.3d at 79).   In addition to eliciting testimony at the hearing, the ALJ must ensure that the record does not contain gaps and includes reports from the treating physician. *See id.*   A claimant is entitled to counsel at the hearing, 20 C.F.R. § 404.916(b)(2), but when the claimant is *pro se*, "the ALJ has a duty . . . to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts. . . ." *Hankerson v. Harris*, 636 F.2d 893, 895 (2d Cir. 1980) (internal quotation marks and citation omitted).

Based on the record it is clear that plaintiff received a full and fair hearing.  Throughout the hearing and in the ALJ's decision he cites the extensive medical history of plaintiff as well as the testimony elicited from plaintiff during the hearing.  (Tr. 12-19, 23-39, 50-57.)  Plaintiff was represented by counsel who was present at the hearing.  (Tr. 20.)  The ALJ was supplied with and reviewed the voluminous medical records prior to the hearing (Tr. 22-23, 47-476, 477-723, 749-54) and questioned plaintiff regarding his injuries.  (Tr. 23-34, 52-53.)  In addition, plaintiff's counsel was permitted to ask questions of plaintiff and the vocational expert as well as recall plaintiff after the vocational expert testified to clarify plaintiff's medical conditions.  (Tr. 34-39, 47-50, 50-55.)  Clearly, plaintiff was given a full and fair hearing.

### B.    **Substantial Evidence**

Plaintiff contends that the ALJ's decision is contrary to law and not supported by substantial evidence in the record.  Specifically, plaintiff argues that the ALJ: (1) failed to properly weigh the medical opinions from plaintiff's treating physicians in determining plaintiff's residual functional

capacity; (2) disregarded plaintiff's complaints of pain; (3) lacked substantial evidence upon which to base the determination that plaintiff had the residual functional capacity to sit for eight hours, stand or walk for four hours in an eight-hour day; and (4) posed a hypothetical to the vocational expert at the ALJ hearing that did not properly reflect the condition of the plaintiff.  We disagree, and find that substantial evidence supports the ALJ's determination that plaintiff was not disabled under the SSA.  We also find that the ALJ analyzed plaintiff's past relevant work experience in accordance with the SSA and accompanying regulations.

### 1.      The ALJ Properly Considered the Medical Opinion of the Treating Physician

As previously stated, the ALJ, in assessing medical evidence, must distinguish between the opinions of treating and nontreating physicians.  *See Carrington*, 2005 WL 2738940, at *6.  The opinion of the treating physician must control when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." (quoting 20 C.F.R. § 416.927(d)(2)).  The Commissioner's regulations also require that a treating physician's opinion be given greater weight than that of a non-treating physician, "especially where the examination by a non-treating physician is for the purposes of the disability proceeding itself."  *Id.*  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)).  If the ALJ declines to afford controlling weight to the opinion of a treating physician, the ALJ must explicitly consider: "'(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and

(iv) whether the opinion is from a specialist.'" *Shaw*, 221 F.3d at 134 (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)).

The record indicates that Dr. Brief was plaintiff's treating physician. The ALJ's decision explicitly states that his determination is based on "the entire record (especially the opinion of Dr. Brief-- Exhibits 3F, 17F and 20F) and . . . the claimant's testimony . . . ." (Tr. 17.) The ALJ reviewed over 200 pages of medical charts from doctors that examined plaintiff, primarily Dr. Brief. (Tr. 163-66, 167-70, 171-73, 178-81, 202-05, 273-74, 307-09, 319, 361-65, 477-723, 747-56.) Plaintiff points out that the ALJ incorrectly attributed to Dr. L. Paul Brief one report that in fact was from Dr. Rochelle Brief. (Pl. Mem. Supp. J. Pldgs. at 22.)[4] The exhibits the ALJ references are lengthy and include materials primarily from Dr. Brief with notes included from other doctors. While plaintiff is correct that the ALJ, when specifically referencing part of an exhibit, wrongly attributed it to Dr. Rochelle Brief (Tr. 14-15), other documents contained in the record that were relied on by the ALJ were generated by Dr. L. Paul Brief. We also note that, in addition to having the same last name, Dr. Rochelle Brief's address is identical to that of Dr. L. Paul Brief. (*Compare* Tr. 483-87 *with* Tr. 164-66, 361-65, 488, 747-48.) As the ALJ stated in his decision, the material primarily relied on came from plaintiff's treating physician Dr. Brief. (Tr. 17.) References to the opinion of other doctors were primarily used in the ALJ's opinion to provide plaintiff's full medical history as well as provide the opinion of doctors specializing in physical medicine, rehabilitation, orthopaedic and neurology. The evidence in the record suggests that appropriate weight was given to the opinion of Dr. L. Paul Brief and, therefore, the ALJ's decision is not contrary to law.

---

[4] Plaintiff's Memorandum in Support of his motion does not contain any page numbers. However, the Court will treat the page containing the case caption as page 1 and reference the corresponding pages where necessary.

## 2.    The ALJ Properly Found That Plaintiff's Subjective Complaints of Pain Are Not Credible

Plaintiff argues that the ALJ failed to take into account plaintiff's subjective complaints of pain and his testimony regarding the severity of his shoulders, neck, hips and knee.  (Pl. Mem. Supp. J. Pldgs. at 19-20.)  Although subjective complaints of pain can support a finding of disability under certain circumstances, "the applicable regulations do require 'medical signs and laboratory findings which show that [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain.'"  *Snell*, 177 F.3d at 135 (quoting 20 C.F.R. § 404.1529(a)) (alteration in original). Where there is conflicting evidence about a claimant's pain, the ALJ must make findings as to credibility.  *See id.*  "When the alleged symptoms suggests greater severity of impairment than the objective medical evidence alone, the ALJ considers all the evidence submitted, and considers 'the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence.'"  *Hodges v. Barnhart*, No. 04 Civ. 2315, 2005 WL 1265891, at *7 (S.D.N.Y. May 25, 2005) (quoting 20 C.F.R. § 404.1259(c)(4)).

Plaintiff testified that he could not raise either arm above chest-level and could not lift anything over five pounds.  (Tr. 26, 27-28.)  In addition, he stated that he could not use his fingers because of carpal tunnel syndrome in both hands, which prevented him from writing or holding a phone for more then three or four minutes.  (Tr. 26-27, 34.)  Plaintiff also testified that the Perthes disease in his hips had progressively worsened over the past ten years causing pressure on his back to the point that he could not sit for more than ten to fifteen minutes at a time or walk more than a block without resting.  (Tr. 28-29, 37, 51-52.)

The ALJ found Mikol's "testimony was not totally consistent with the medical evidence." (Tr. 16.)  First, the ALJ noted that plaintiff's complaints of severe carpal tunnel syndrome in his

hands and fingers appeared "highly exaggerated." (*Id.*) The ALJ reached this determination because there were "no clinical observation since the fall of 2002 (when he was diagnosed with 'mild' carpal tunnel syndrome) to corroborate such extreme symptoms." (*Id.*) Second, the ALJ observed that the evidence suggested that "the intensity, persistence and functionally limiting effects of his symptoms do not totally preclude his ability to perform basic work-related activities." (*Id.*) This opinion was based on the ALJ's determination that the medical records did not corroborate plaintiff's claims of extreme debilitation and that plaintiff's claims appeared exaggerated and inconsistent with the record. (Tr. 16-17.) Specifically, the ALJ noted that "[t]he claimant's attorney advised the ALJ that he has requested that the claimant's treating physicians provide 'residual functional capacity' assessment, but that they have declined to do so." (Tr. 16.) In addition, the ALJ pointed to testimony of plaintiff indicating that he is able to do light housework and drive his six-year-old daughter to school. (Tr. 16, 32-33.)

Based on our review of the medical records, we find substantial evidence supports the ALJ's determination to discredit Mikol's testimony regarding particular aspects of his alleged disability and we see no need to disturb this decision. *See Tejada*, 167 F.3d at 775-76 (citing *Pascariello v. Heckler*, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985) "([N]oting that after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility, the ALJ, in resolving conflicting evidence, may decide to discredit the claimant's subjective estimation of the degree of impairment.)"; *see also Jordan v. Apfel*, 192 F. Supp. 2d 8, 13-14 (W.D.N.Y. 2001). This Court must affirm the ALJ's decision to discount a claimant's subjective complaints of pain when it is supported by substantial evidence. *See Aponte v. Sec'y of Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). Indeed, "it [is] within the discretion of the ALJ to give the subjective

complaints of pain less weight relative to objective medical evidence." *Bellamy v. Apfel*, 110 F. Supp. 2d 81, 94 (D. Conn. 2000).  The medical evidence indicates that plaintiff had mild carpal tunnel syndrome in the fall of 2002.  (Tr. 483-85.)  There is no mention of carpal tunnel symptoms after that point with the exception of Dr. Li's observation in December 2002 that plaintiff's hand and finger dexterity was intact.  (Tr. 185-88.)

Plaintiff asserts that he has undergone numerous surgeries, tests and physical therapy to recover from the damage caused by the Perthes disease and that "[a]ll of his doctors cited his pain." (Pl. Mem. Supp. J. Pldgs. at 19.)  Plaintiff does not specifically indicate which doctors or what records cited to plaintiff's pain nor direct the Court to the pages of the record that support this statement.  Regardless, "[d]eterminations of work capacity do not fall with the purview of medical opinion, but are reserved to the Commissioner."  *Hodges*, 2005 WL 1265891, at *7.  Accordingly, we find that the ALJ properly discounted plaintiff's subjective complaints of pain.

### 3.      Substantial Evidence Supports the ALJ's Decision on Residual Functional Capacity

An assessment of residual functional capacity is based on relevant medical and other evidence and measures an "individual's maximum remaining ability to perform sustained work on a regular and continuing basis; i.e., 8 hours a day, for 5 days a week . . . ."  61 Fed. Reg. 34,479; *see* 20 C.F.R. § 404.1545(a)(1), (3).  It requires the Commissioner to make a "thorough inquiry into the objective medical facts, diagnoses or medical opinions inferable from these facts, subjective complaints of pain or disability, and educational background, age, and work experience."  *Hodges*, 2005 WL 1265891, at *5 (citing *Mongeur*, 722 F.2d at 1037).

The ALJ determined that plaintiff had the "residual functional capacity" to sit for up to and

24

including eight hours and stand or walk for up to and including four hours in an eight-hour workday. (Tr. 18.)   In addition, the ALJ determined that plaintiff could lift or carry objects weighing up to and including ten pounds, but could not reach above his shoulder with either arm and not perform repetitive finger tasks or fine manipulations more than 75% of the time during a typical work day. (*Id.*)

Plaintiff objects to this assessment because he asserts that there is no evidence indicating how the ALJ determined that plaintiff could sit and stand for that length of time nor did the ALJ consider the pain plaintiff allegedly suffers.  (Pl. Mem. Supp. J. Pldgs. at 18-20.)  As discussed, the ALJ made credibility determinations regarding plaintiff's pain and abilities to sit and stand for certain lengths of time.  (Tr. 16-17.)   These findings are supported by substantial evidence in the record and therefore we will not disturb the ALJ's decision.

### 4.   The ALJ's Posed Hypothetical Questions to the Vocational Expert Accounted for Plaintiff's Capabilities and Impairments

"'The ALJ must pose hypothetical questions to the vocational expert which reflect the full extent of the claimant's capabilities and impairments to provide a sound basis for the [expert]'s testimony.'" *Jehn v. Barnhart*, 408 F. Supp. 2d 127, 135 (E.D.N.Y. 2006) (citing *Sanchez v. Barnhart*, 329 F. Supp. 2d 445, 449-50 (S.D.N.Y. 2004)) (alteration in original); *see De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 936 (2d Cir. 1984).  "Vocational testimony elicited by hypothetical questions that fail to relate with precision to the physical and mental impairments of a claimant is not substantial evidence on which an ALJ may base a decision."  *Matthews v. Barnhart*, 220 F. Supp. 2d 171, 175 (W.D.N.Y. 2002) (citing *Bradley v. Bowen*, 800 F.2d 760, 763 (8th Cir. 1986)).

At the ALJ hearing, a vocational expert, Andrew Pasernack, answered questions regarding plaintiff's abilities to perform certain tasks.  (Tr. 39-50.)  The hypothetical that the ALJ posed to the vocational expert was as follows:

> Assume that a person could sit for six hours a day, stand for two hours a day. Assume further that that person can lift on a sustained basis five pounds of weight and assume further the person cannot reach with his upper extremities above shoulder length.  And assume further the person could perform fingering or fine manipulations about 50 percent of the time during the course of a workday.  There's no other restrictions.

(Tr. 42.)  Based on this hypothetical, the vocational expert determined that plaintiff could find work as a telemarketer or a surveillance monitor.  (Tr. 17, 42-45.)  The vocational expert testified that there were approximately 300,000 telemarketing jobs in the national economy (11,000 locally) and 250,000 surveillance monitor jobs in the national economy (5,000 locally).[5]  (Tr. 17, 42-45.)

In his the decision, the ALJ determined, based on medical evidence, that plaintiff "cannot perform repetitive finger tasks or fine manipulations more than 75% of the time during a typical work day."  (Tr. 17.)  Plaintiff asserts that this hypothetical does not accurately reflect his condition because his capabilities are more restricted than those of the hypothetical person.  (Pl. Mem. Supp. J. Pldgs. at 18-19.)  Plaintiff has it backwards, however, as the person in the hypothetical is more restricted than the plaintiff.

The ALJ's decision states that plaintiff cannot perform repetitive finger tasks or fine manipulations *more than* 75% of the typical work day, implying that plaintiff *can* perform these functions up to and including 75% of the day.  In the hypothetical posed, the individual could

---

[5] Plaintiff questions the veracity of the vocational expert's determination in reaching these numbers as a "hocus pocus science."  (Pl. Mem. Supp. J. Pldgs. at 21.)  However, there is no evidence proffered to suggest that these numbers are inaccurate.  In addition, Mr. Pasernack appears fully qualified to testify on this matter.  (Tr. 39, 92.)

perform these functions only approximately 50% of the day, which is substantially less than the 75% of the time the ALJ determined plaintiff was capable of doing so. Plaintiff, having outlined the tasks he believes necessary in performing the job responsibilities of a telemarketer, makes the bold assertion that "[c]ertainly [telemarketers] are using their hands more than 50% of the time." (Pl. Mem. Supp. J. Pldgs. at 21.) Plaintiff offers no support for this assessment. We are confident that the vocational expert's opinion correctly assessed the amount of time a telemarketer is required to do fine finger manipulations and there is nothing in the record to suggest otherwise. In addition, the vocational expert stated that the typing and fingering tasks of a telemarketer is "[c]ertainly 50 percent, no more than that." (Tr. 44.) Plaintiff's attorney also had an opportunity to question the vocational expert and posed his own hypothetical which included the limiting factors plaintiff asserts. (Tr. 47-50.) After presenting his own hypothetical, the ALJ permitted plaintiff's attorney to recall plaintiff to elicit more testimony. (Tr. 50-54.) Therefore, the testimony was received and certainly considered by the ALJ in making his determination. Moreover, the vocational expert stated that the tasks of a surveillance systems monitor, the other job he determined plaintiff was qualified for, requires no fine finger manipulations at all. (Tr. 45.)

Plaintiff also argues that the ALJ determined that he had no transferable skills from his past work to qualify him for the jobs of a telephone solicitor or surveillance system monitor.[6] (Pl. Mem.

---

[6] Plaintiff argues that the job of a surveillance system monitor "may require the use of a computer and therefore may not be unskilled but also may be a semi-skilled job. This job really should have an SVP of 3." (Pl. Mem. Supp. J. Pldgs. at 21.) We note that it is not for this Court to determine what SVP (specific vocational preparation) time a particular task requires. The vocational expert, who testified at the ALJ hearing indicated that a surveillance system monitor would have an SVP of 2, which, according to the Dictionary of Occupational Titles, would require a typical worker anywhere from a short demonstration to one month to learn the skills necessary to perform this tasks. In addition, the vocational expert testified that plaintiff's past jobs were semi-skilled and had higher SVP levels of 5 and 7, requiring a longer time to learn the necessary skills for the job. (Tr. 41.)

Supp. J. Pldgs. at 20.)  Plaintiff's arguments regarding why he would be unable to perform these tasks are directed to plaintiff's alleged pain, inability to sit for extended periods of time and limited use of his fingers. (Pl. Mem. Supp. J. Pldgs. at 18-20.)  As indicated, the ALJ found these symptoms to be exaggerated and determined that plaintiff could perform these tasks, based on a credibility evaluation of the plaintiff's testimony in light of the medical record. (Tr. 16-17.)  We also note that, at least with respect to the surveillance system monitor position, plaintiff has previous experience in building security, which implies that he would have the skills necessary to perform this task. (Tr. 145.)

## CONCLUSION

For all of the foregoing reasons, the motion of defendant Jo Anne B. Barnhart, the Commissioner of Social Security (the "Commissioner") for judgment on the pleadings is granted and the motion of plaintiff Bruce W. Mikol for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) is denied, thereby affirming the Commissioner's decision.  The Clerk's Office is directed to enter judgment in favor of the Commissioner.

SO ORDERED.

Dated: White Plains, New York
       May 25, 2007

_William C. Conner_
Sr. United States District Judge